Kaleigh N. Boyd, OSB No. 253094
MCNAUL EBEL PLLC
600 University Street, Suite 2700
Seattle, WA 98101
Tel: (206) 467-1816
kboyd@mcnaul.com

*[Additional counsel listed on signature page]*

*Attorneys for Plaintiffs and the Proposed Class*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| AARON PARISI and CARLOS ARIS, individually and on behalf of all others similarly situated, | NO. |
| Plaintiffs, | PLAINTIFFS' CLASS ACTION COMPLAINT FOR DAMAGES |
| vs. | DEMAND FOR JURY TRIAL |
| ADIDAS AMERICA, INC., | |
| Defendant | |

Plaintiffs Aaron Parisi and Carlos Aris, ("Plaintiffs") on behalf of themselves and all others similarly situated, by and through counsel, bring this action against Defendant Adidas America, Inc. ("Defendant" or "Adidas America").[1] The allegations contained herein, which are based on Plaintiffs' knowledge of facts pertaining to themselves and their own actions and counsels' investigations, and upon information and belief as to all other matters, are as follows:

---

[1] Adidas America is a wholly owned subsidiary of Adidas AG ("Adidas AG") (collectively with Adidas America, "Adidas").

1

**NATURE OF THE CASE**

1.      This class action arises from Adidas's retention of windfall profits generated by unlawful tariffs imposed by the federal government under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701, *et seq*.

2.      Beginning in February 2025, the federal government imposed sweeping tariffs on imports from numerous countries under purported authority of the IEEPA. Those tariffs dramatically increased the cost of imported consumer goods sold in the United States.

3.      Major U.S. importers—including Adidas—responded by increasing prices on consumer goods to offset the cost of these tariffs. On April 29, 2025, Adidas implemented price increases on certain footwear and clothing. As a result, American consumers paid higher retail prices for consumer goods reflecting the economic burden of those tariffs.

4.      On February 20, 2026, the Supreme Court of the United States held that the IEEPA-based tariffs were unlawful. *Learning Resources, Inc. v. Trump*, 607 U.S. ___ (2026).

5.      As a consequence of that decision, importers who paid those tariffs—including Adidas—became entitled to refunds of the duties they previously paid to U.S. Customs and Border Protection ("CBP").

6.      The economic reality of the tariff regime, however, is that importers like Adidas did not ultimately bear all the costs of the tariffs. Instead, the importers passed the elevated costs on to consumers in the form of higher retail prices.

7.      Adidas therefore collected the tariff costs from consumers through elevated pricing, while seeking refunds of the same tariff payments from the federal government.

8.      Adidas' parent company filed suit seeking tariff refunds. Adidas's CEO told investors that it is entitled to tariff refunds of more than $300 million.

9.      Unless restrained by this Court, Adidas stands to recover the same tariff payments twice—once from consumers through higher prices and again from the federal government through tariff refunds, including interest paid by the government on those funds.

10. Adidas has made no legally binding commitment to return tariff-related overcharges to the consumers who actually paid them.

11. This lawsuit seeks to prevent that unjust result.

12. Plaintiffs bring this action on behalf of millions of consumers who purchased goods from Adidas during the tariff period and who paid inflated prices reflecting Adidas's pass-through of unlawful tariffs.

13. Plaintiffs seek restitution of those tariff overcharges, together with appropriate declaratory, injunctive, and monetary relief.

## JURISDICTION AND VENUE

14. Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because: (a) Plaintiffs and at least one member of the class is a citizen of a state different from Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under that subsection apply to this action.

15. The Court has personal jurisdiction over Defendant because Adidas is headquartered in this district, conducts significant business transactions in this District, and because the wrongful conduct occurred in and emanated from this District.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant's principal place of business in located in this District in Portland, Oregon, and a substantial portion of the events and conduct giving rise to the claims occurred in the District of Oregon.

## PARTIES

18. Plaintiff Aaron Parisi is a resident and citizen of Seattle, Washington. During the Class Period, Plaintiff Parisi purchased goods from Adidas that were imported from countries subject to the IEEPA tariffs. Plaintiff Parisi paid retail prices for those goods that were increased by Adidas to account for the tariffs imposed on imported products. Plaintiff Parisi would not have paid those higher prices absent the unlawful tariffs and Adidas's pass-through of those tariffs to consumers.

19. Plaintiff Carlos Aris is a resident and citizen of Revere, Massachusetts. During the Class Period, Plaintiff Aris purchased goods from Adidas that were imported from countries subject to the IEEPA tariffs. Plaintiff Aris paid retail prices for those goods that were increased by Adidas to account for the tariffs imposed on imported products. Plaintiff Aris would not have paid those higher prices absent the unlawful tariffs and Adidas's pass-through of those tariffs to consumers.

20. Defendant **Adidas America Inc.** is an Oregon corporation with its principal place of business at 5055 N. Greeley Ave., Portland, OR 97217. Adidas America is a wholly owned subsidiary of Adidas AG, a German company headquartered in Herzogenaurach. Adidas America is responsible for the marketing, distribution, and sale of Adidas products in the United States. Adidas AG develops, designs, manufactures, and sells athletic footwear and apparel. A significant portion of the products Adidas sells are imported goods subject to IEEPA tariffs imposed by the United States government.

## FACTUAL BACKGROUND

### A. Adidas's Business

21. Adidas is one of the largest athletic footwear and apparel suppliers in the United States.

22. Adidas markets and sells a broad portfolio of products under the "Adidas" brand, including its "Performance" products represented by 3-Bar logo and designed for athletes, as well as its "Lifestyle" products represented by three-leaf-shaped Trefoil logo and evoking brand classics and new visionary designs to consumers.[2]

23. Adidas products are sold nationwide through wholesale channels to retail partners, through e-commerce channels, and through its own retail stores. Adidas's global headquarters is in Herzogenaurach, Germany, but the North American market is managed in

---

[2] *See* Adidas Group, *Annual Report 2025*, 56, available at https://report.adidas-group.com/2025/en/_assets/downloads/annual-report-adidas-ar25.pdf (last visited May 19, 2026).

Portland, and Portland is the site of a regional "creation center" that develops products tailored to local consumer needs.[3]

24. Adidas's business model depends heavily on the sourcing of its products through global supply chains. Adidas outsources almost all its production to independent manufacturing partners, with the vast majority located in Asia.[4]

25. In 2025, 92% of Adidas's total volume of products was sourced through independent manufacturing partners located in Asia. In 2025, Vietnam remained Adidas's largest sourcing country with 27% of the company's total volume, followed by Indonesia at 18% and China at 16% of total volume.[5]

26. Imported goods therefore account for most, if not virtually all, of Adidas's retail sales in the United States. Because Adidas imports most if not all of the goods it sells, the IEEPA tariffs directly increased Adidas's cost of importing merchandise into the United States.

**B. The IEEPA Tariffs**

27. Beginning in February 2025, President Trump invoked the **IEEPA** to impose tariffs on imports from numerous foreign countries pursuant to a series of executive orders declaring national emergencies related to trade and supply chain concerns.[6]

28. Those executive orders imposed sweeping tariffs on imports from key U.S. trading partners. The orders included duties of approximately **25 percent on many imports from Canada and Mexico** and additional tariffs on imports from China that were layered on top of existing duties, resulting in substantially higher effective tariff rates on Chinese goods.[7]

---

[3] *Id*. at 64–66.

[4] *Id*. at 67.

[5] *Id*. at 68.

[6] *See* Exec. Order No. 14194, *Imposing Duties To Address the Situation at Our Southern Border*, 90 Fed. Reg. 9,117 (Feb. 7, 2025); Exec. Order No. 14193, *Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 9,113 (Feb. 7, 2025); Exec. Order No. 14195, *Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,121 (Feb. 7, 2025).

[7] *See* Reuters, *Trump Orders Tariffs on Canada, Mexico and China*, Feb. 1, 2025.

29.     The tariffs significantly increased the cost of imported consumer goods entering the United States, particularly for retailers and other businesses that rely heavily on international supply chains to source merchandise—like Defendant Adidas.[8]

30.     Under U.S. customs law, the **importer of record** is responsible for paying tariffs when goods enter the United States. Accordingly, importers of record—including major retailers such as Adidas—were required to pay the IEEPA tariffs to **U.S. CBP** upon entry of covered merchandise into the country.[9]

31.     Numerous importers challenged the legality of the IEEPA tariffs in the United States Court of International Trade, arguing that the President lacked statutory authority under IEEPA to impose tariffs of that nature.[10]

32.     On February 20, 2026, the Supreme Court of the United States held that the challenged tariff regime was unlawful and that IEEPA does not authorize the President to impose tariffs of the type challenged in that litigation and invalidated the tariff orders issued pursuant to that statute.[11]

33.     The Supreme Court's decision effectively eliminated the legal basis for the IEEPA tariffs and created a pathway for importers that had paid those duties—including large retailers like Adidas—to seek refunds of the tariffs previously collected by the federal government.

**C.     Tariffs Are Economically Borne by Consumers**

34.     Economists and government agencies have widely recognized for decades that tariffs are largely borne by domestic consumers rather than foreign exporters or the importing

---

[8] *See* Mary Amiti, Stephen J. Redding & David Weinstein, *The Impact of the 2018–2019 Tariffs on Prices and Welfare*, 135 J. Econ. Persp. 187 (2020).

[9] *See* U.S. Customs & Border Prot., *Importing Into the United States: A Guide for Commercial Importers*.

[10] *See* Reuters, *Businesses Sue Over Trump's Tariffs*, Apr. 2025.

[11] *See Learning Res., Inc. v. Trump*, 607 U.S. ___ (2026).

firms that formally remit the duties.

35.    As Nobel-Prize winning economist Dr. Milton Friedman famously quipped in 1978, tariffs act as a consumption tax that "protects the consumer against low prices."[12]

36.    Economist Dr. Douglas Holtz-Eaton, Director of Economic Policy Studies at the American Enterprise Institute stated "[t]ariffs are a national partial sales tax, and they're paid by all purchasers—consumers and businesses. So it shows up ultimately on the consumer tab after businesses pass it through."[13]

37.    Dr. N. Gregory Mankiw, Harvard economics professor and former Chairman of the Council of Economic Advisers under President George W. Bush stated "[t]ariffs are paid by domestic consumers, not by foreign exporters.  . . . What was originally proposed regarding tariff policy is considered economic malpractice on a grand scale."[14]

38.    Economic studies examining recent U.S. tariff regimes consistently find that the cost of tariffs is passed through into higher prices paid by U.S. purchasers of imported goods.[15]

39.    When tariffs increase the cost of imported goods, retailers and other downstream sellers typically raise prices to offset those additional costs. Surveys of U.S. businesses conducted by the Federal Reserve Bank of New York during the recent tariff period found that a

---

[12] https://www.k-state.edu/landon/speakers/milton-friedman/transcript.html (last visited May 21, 2026).

[13] https://www.americanactionforum.org/multimedia/the-aaf-exchange-ep-169-trumps-first-100-days-and-the-latest-on-reconciliation/ (last visited May 21, 2026).

[14] https://www.hks.harvard.edu/centers/mrcbg/programs/growthpolicy/tariff-policies-are-large-scale-economic-malpractice; https://news.cgtn.com/news/2025-04-22/Harvard-professor-US-tariffs-are-large-scale-economic-malpractice-1CMssVRkapW/index.html (last visited May 21, 2026).

[15] *See* Julian Hinz et al., *America's Own Goal: Who Pays the Tariffs?*, Kiel Inst. for the World Econ. Policy Brief (Jan. 19, 2026); see also Mary Amiti, Stephen J. Redding & David Weinstein, *The Impact of the 2018–2019 Tariffs on Prices and Welfare*, 135 J. Econ. Persp. 187 (2020).

large majority of firms facing tariff-related cost increases passed at least some portion of those costs through to their customers in the form of higher prices.[16] Companies consider tariffs to be costs that are to be incorporated into the pricing structure.

40. Similarly, the Federal Reserve Bank of Dallas recently confirmed that the 2025–2026 tariffs materially increased consumer prices and that "pass-through from the 2025 tariffs is effectively complete," meaning the costs of the tariffs were ultimately borne by purchasers through higher prices.[17]

41. The Dallas Federal Reserve further explained that tariff collections "boosted core goods PCE[18] inflation by approximately 2.2 percentage points" and increased overall core PCE inflation by approximately 0.8 percentage points, reflecting widespread downstream price increases imposed on consumers as businesses passed tariff costs through the supply chain.[19]

42. These findings confirm that tariffs imposed during the relevant period functioned as a direct economic burden on consumers because businesses responded to the tariffs by increasing prices charged to end purchasers rather than internally absorbing the additional costs.

---

[16] *See* Jaison R. Abel, Richard Deitz & Jason Bram, *Are Businesses Absorbing the Tariffs or Passing Them On to Their Customers?*, Fed. Rsrv. Bank of N.Y., Liberty Street Econ. (June 4, 2025), available at https://libertystreeteconomics.newyorkfed.org/2025/06/are-businesses-absorbing-the-tariffs-or-passing-them-on-to-their-customers/ (last visited May 19, 2026).

[17] *See* Ron Mau & Tucker Smith, Effects of Realized Tariff Changes on PCE Prices Peaked in First Quarter 2026, Fed. Rsrv. Bank of Dall. (May 5, 2026),  available at https://www.dallasfed.org/research/economics/2026/0505-mau. (last visited May 19, 2026).

[18] "PCE" refers to Personal Consumption Expenditures, an economic measure of how much consumers are spending on goods and services in the economy.

[19] *See* Ron Mau & Tucker Smith, Effects of Realized Tariff Changes on PCE Prices Peaked in First Quarter 2026, Fed. Rsrv. Bank of Dall. (May 5, 2026),  available at https://www.dallasfed.org/research/economics/2026/0505-mau (last visited May 19, 2026).

43.     Adidas followed this same pattern during the tariff period. As a major importer of consumer goods, Adidas faced increased costs resulting from tariffs on its products and took steps to address those cost pressures through pricing and merchandising decisions.[20] [21] [22]

44.     Indeed, as detailed below, Adidas publicly acknowledged that tariffs would affect pricing decisions and the company's cost structure. In those communications, Adidas explained that tariffs increased the company's merchandise costs and required Adidas to evaluate price adjustments and other operational responses designed to manage those additional expenses.

45.     As a result, consumers who purchased goods from Adidas during the tariff period paid elevated prices reflecting the tariff-related cost increases incorporated into Adidas's retail pricing.

**D.     Adidas's Statements Regarding Tariff Related Price Increases and Refunds**

46.     Adidas publicly acknowledged, early in the tariff period, that tariffs would increase its costs and place upward pressure on consumer prices.

47.     On April 29, 2025, Adidas joined as a signatory in a letter by the Footwear Distributors & Retailers of America ("FDRA") addressed to the President of the United States stating that:

> The significant price increases from these tariffs will preclude these American consumers from having affordable footwear options. ... We are in fact the one

---

[20] *See* Melissa Eddy, New York Times, *Adidas Warns Sneakers Will Cost More in the U.S. as Trump's Tariffs Take Effect* (April 29, 2025), available at https://www.nytimes.com/2025/04/29/business/trump-tariffs-adidas-shoes.html (last visited May 19, 2026).
[21] *See* Rachel Clun, BBC, *Adidas to raise prices as US tariffs costs rise by €200m* (July 30, 2025), available at https://www.bbc.com/news/articles/cjey0zv1pkqo (last visited May 19, 2026).
[22] *See* Linda Pasquini and Helen Reid, Yahoo Finance, *Adidas North America sales hit by weak dollar, CEO says tariff impact still unclear* (October 29, 2025), available at https://finance.yahoo.com/news/adidas-north-america-sales-hit-122459248.html (last visited May 19, 2026).

industry where tariffs do not significantly increase domestic production; tariffs just become a major impact at the cash register for every family.[23]

48.     Consistent with its assertions in the FDRA letter regarding tariffs costs being passed down to the consumer, Adidas publicly announced that it would be implementing price increases in response to the tariffs. Specifically, Adidas announced a series of price increases starting on or about April 29, 2025 to mitigate and offset operating losses caused by the tariffs.[24]

49.     On April 29, 2025, Adidas said the tariffs would eventually cause higher costs for all its products on the U.S. market, since it could not produce almost any products in the United States.[25] On July 30, 2025, Adidas said the tariffs would "directly increase" the cost of its products up to €200 million during the rest of the year, added to the existing negative impact of such tariffs in the double-digit euro millions.[26] On October 29, 2025, Adidas said it expected the tariffs to shave €120 million off its operating profits for 2025, down from €200 million after the company offset a portion of the tariff hit with price hikes and supply chain changes.[27]

50.     Adidas CEO Bjorn Gulden said the company tried not to hike prices on its cheaper shoes and clothes, where consumers were more sensitive to price increases, and, when possible, opted to raise prices on more expensive models and new models. Gulden said the consumer reaction to its price points was "too early to say." Adidas's popular Samba sneakers were increased from $90 to $100.[28]

---

[23] *See* FDRA Footwear Distributors & Retailers of America Letter to President Donald Trump (April 29, 2025), available at https://fdra.org/wp-content/uploads/2025/04/April-29-Footwear-POTUS-Letter.pdf (last visited May 19, 2026).

[24] *See supra* n.17; *see also supra* n.18; *see also supra* n.19.

[25] *See* Adidas Group, *Press Release* (April 29, 2025), available at https://www.adidas-group.com/en/media/press-releases/adidas-delivers-better-than-expected-first-quarter-results (last visited May 19, 2026).

[26] *See* Adidas Group, *Press Release* (July 30, 2025), available at https://www.adidas-group.com/en/media/press-releases/continued-strong-double-digit-growth-for-adidas-brand-in-the-second-quarter-of-2025 (last visited May 19, 2026).

[27] *See supra* n.19.

[28] *See* Adidas AG, Q3 2025 Earnings Call (October 29, 2025), available at https://seekingalpha.com/article/4834828-adidas-ag-addyy-q3-2025-earnings-call-transcript (last visited May 19, 2026); *see also supra* n.19.

51.    On May 7, 2026, after the Supreme Court struck down the IEEPA tariffs, Adidas said it would be entitled to a refund of $300 million from such unlawful tariffs. Gulden said, "We haven't booked [the refund] yet, but there's a very good chance it will happen."[29]

52.    Adidas's public statements and actions thus confirmed two critical points: first, that tariffs were increasing Adidas's costs on imported goods; and second, that Adidas was making pricing decisions in direct response to those tariff-driven cost increases. Indeed, Adidas did not simply absorb the full cost of the unlawful tariffs; rather, Adidas passed on at least part of those costs to consumers through higher retail prices.

53.    Adidas's own public statements and actions therefore establish a coherent timeline: Adidas acknowledged tariff-driven cost increases and Adidas selectively increased prices on affected goods during the tariff period.

54.    Plaintiffs and Class members paid tariff-inflated prices at Adidas during the Class Period, while Adidas now seeks to retain both the consumer pass-through and any government refund of the same unlawful tariff charges.

E.    **Adidas's Lawsuit Seeking Tariff Refunds**

55.    On April 2, 2026, Adidas filed suit in the United States Court of International Trade challenging the legality of the tariffs imposed under IEEPA. Adidas brought the action in its capacity as a U.S. importer that had paid duties under the challenged tariff regime.[30]

56.    In that action, Adidas sought declaratory and injunctive relief invalidating the IEEPA tariffs and requested refunds of all duties collected from Adidas under those tariff orders.[31]

---

[29] *See* Reuters, *Adidas is entitled to refund of $300 mln from US tariffs, CEO says* (May 7, 2026), available at https://www.reuters.com/business/adidas-is-entitled-refund-300-mln-euros-us-tariffs-ceo-says-2026-05-07/; see also Adidas Group, Annual Shareholders Meeting 2026 Webcast (May 7, 2026), available at https://www.adidas-group.com/en/investors/annual-general-meeting (last visited May 19, 2026).

[30] *See Adidas America Inc. v. United States,* No. 26-02031 (Ct. Int'l Trade filed April 2, 2026).

[31] *Id.*

57.    As described above, in February 2026, the Supreme Court held that the President's tariff regime exceeded the statutory authority granted by IEEPA and invalidated the challenged tariff orders.[32] Following the SCOTUS decision, importers that had paid IEEPA tariffs—including Adidas—became eligible to pursue refunds of those duties.

58.    On March 4, 2026, the Court of International Trade, in *Atmus Filtration, Inc. v. United States*, ordered U.S. CBP to stop liquidating IEEPA duties and to reliquidate previously liquidated IEEPA duties where possible, and indicated that the relief extended to **"all importers of record"** that paid IEEPA duties, including importers that had not filed their own refund suits.[33]

59.    The potential refund pool resulting from the invalidation of the IEEPA tariffs is enormous. Public reporting concerning the refund proceedings states that U.S. CBP estimated an "unprecedented volume of refunds," potentially involving **53,173,939 refunds** across **330,566 importers** if each entry subject to IEEPA duties is entitled to a refund.[34]

60.    As described above, after the Supreme Court struck down the IEEPA tariffs, Adidas's CEO told investors that it would be entitled to a refund of $300 million from such unlawful tariffs.[35]

61.    Adidas is among the country's largest importers of consumer goods and therefore stands to recover substantial sums if tariff refunds are paid.

62.    Given Adidas scale as a major importer, Adidas can expect to recover significant tariff refunds corresponding to duties it paid during the Class Period. Those expected refunds are especially significant here because Adidas previously passed tariff-related cost increases through to consumers in the form of higher retail prices, meaning Adidas now seeks to recover from the

---

[32] *See Learning Res., Inc. v. Trump*, 607 U.S. ___ (2026).

[33] *See Atmus Filtration, Inc. v. United States*, No. 26-01259, (Ct. Int'l Trade Mar. 4, 2026), ECF No. 21.

[34] *See* Thompson Hine LLP, *CIT Suspends Earlier Order Directing IEEPA Tariff Refunds* (Mar. 6, 2026), https://www.thompsonhinesmartrade.com/2026/03/cit-suspends-earlier-order-directing-ieepa-tariff-refunds/ (last visited May 19, 2026).

[35] *See supra* n.26.

government duties whose economic burden was borne, in whole or in part, by Plaintiffs and Class members.

63.     In practical terms, Adidas stands to receive a windfall: it has already recouped tariff costs from consumers through higher prices, and it now stands in line to recover those same unlawful tariff payments from the federal government.

**CLASS ALLEGATIONS**

64.     A class action is the proper forum to bring Plaintiffs' claims under FRCP 23. The potential Class is so large that joinder of all members would be impracticable. Additionally, there are questions of law or fact common to the Class, the claims or defenses of the representative parties are typical of the claims or defenses of the Class, and the representative parties will fairly and adequately protect the interests of the Class.

65.     This action satisfies all of the implicit and explicit requirements of FRCP, including numerosity, commonality, typicality, adequacy, predominance and superiority.

66.     **Numerosity**: the Class is so numerous that joinder of all members is impracticable.  While the exact number is not known at this time, it is generally ascertainable by appropriate discovery.  Given the consumer base of Adidas, the class numbers in the hundreds of thousands or millions of consumers.

67.     **Commonality:** the claims made by Plaintiffs meet the commonality requirement because they present shared questions of law and fact, and resolving these questions will resolve the classwide litigation. These shared questions predominate over individual questions, and they include, without limitation:

    a.   whether Adidas paid tariffs imposed under the International Emergency Economic Powers Act ("IEEPA") on imported goods during the Class Period;

    b.   whether Adidas increased retail prices on goods sold to consumers in response to those tariffs;

    c.   whether Adidas passed through some or all of the tariff costs to consumers through higher prices;

d.  whether Adidas sought or will seek refunds of those tariffs from the federal government;

e.  whether Adidas's retention of tariff refunds corresponding to tariff costs paid by consumers constitutes unjust enrichment;

f.  whether Adidas's conduct was unfair under applicable consumer protection laws; and

g.  the appropriate measure of restitution, damages, or other relief resulting from Adidas's conduct.

68.     **Typicality**: Plaintiffs' claims are typical of those of the other Class members because Plaintiffs, like every other Class member, bought products from Adidas subject to tariff related price increases.

69.     The claims of the Class Representative Plaintiffs are furthermore typical of other Class members because they make the same claims as other Class members. Plaintiffs have an interest in seeking compensation from Defendant.

70.     **Adequacy**: Plaintiffs will fairly and adequately represent and protect the interests of the Class in that they have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages they have suffered are typical of other Class members.

71.     **Superiority:** The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of class members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain class members, who could not individually afford to litigate a complex claim against large corporate defendants. Further, even for those

14

class members who could afford to litigate such a claim, it would still be economically impractical.

72.    The nature of this action and the nature of federal and state laws available to Plaintiffs and the Class makes the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and the Class for the wrongs alleged. Without the class action mechanism, Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class member with superior financial and legal resources; and the costs of individual suits could unreasonably consume the amounts that would be recovered. Likewise, proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class, and will establish the right of each member of the Class to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

73.    The proposed National Class is described as follows:

> All persons in the United States who purchased goods from Adidas during the class period on which Adidas increased prices due to IEEPA tariffs.

74.    The proposed Washington Class is described as follows:

> All persons in Washington who purchased goods from Adidas during the Class Period on which Adidas increased prices due to IEEPA tariffs.

75.    Plaintiffs reserve the right to modify or amend the definition of the proposed class and to modify, amend or remove proposed subclasses, before the Court determines whether certification is appropriate and as the parties engage in discovery.

76.    Plaintiffs will fairly and adequately protect the interests of the Class. The interests of the class representative are consistent with those of the other members of the Class. In addition, Plaintiffs are represented by experienced and able counsel who have expertise in the areas of tort law, trial practice, and class action representation.

77. The class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Because of the number and nature of common questions of fact and law, multiple separate lawsuits would not serve the interest of judicial economy.

78. Excluded from the Class are:

a. Defendant and any entities in which Defendant has a controlling interest;

b. Any entities in which Defendant's officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of Defendant;

c. The Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case;

d. All persons or entities that properly execute and timely file a request for exclusion from the Class; and

e. Any attorneys representing the Plaintiffs or the Class.

## CLAIMS FOR RELIEF
### COUNT I
### Unjust Enrichment
### (On behalf of Plaintiffs and the Class)

79. Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

80. Plaintiffs and the Class have conferred a benefit upon Defendant in the form of the money Defendant received from them in the form of price increases on goods during the period April 29, 2025, through February 20, 2026.

81. Defendant appreciates and/or has knowledge of the benefits conferred upon it by Plaintiffs and the Class.

82. Under principles of equity and good conscience, Defendant should not be permitted to retain the amount of the price increases obtained from Plaintiffs and the members of the Class, which Defendant has unjustly obtained as a result of its price increases on goods

16

subject to unlawful tariffs. As it stands, Defendant has retained profits generated from its sales of products subject to tariff-related price increases and should not be permitted to retain those ill-gotten profits when it is seeking a refund of the duties it paid.

83.    Accordingly, Plaintiffs and the Class seek full disgorgement and restitution of any money Defendant has retained as a result of the unlawful and/or wrongful conduct alleged herein.

**COUNT II**
**Money Had and Received**
**(On behalf of Plaintiffs and the Class)**

84.    Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

85.    Plaintiffs allege this claim individually and on behalf of the proposed class.

86.    Defendant received money from Plaintiffs and from each member of the proposed Class in the form of a tariff surcharge. The Supreme Court has determined that the tariffs were unlawful.

87.    The money belonged to Plaintiffs and to each member of the proposed Class.

88.    Defendant has not returned the money.

89.    It will give offense to equity and good conscience if Defendant is permitted to retain the tariff surcharge. Plaintiffs seek the return of the money in an amount to be proven at trial.

90.    Plaintiffs seek all remedies available under the law, including, if available, actual damages, nominal damages, compensatory damages, punitive damages, and injunctive relief, and other remedies available to them.

**COUNT III**
**Violations of the Washington Consumer Protection Act, § RCW 19.86.010, et seq.**
**(On behalf of Plaintiff Parisi and the Washington Class)**

91.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

17

92.    Defendant advertised, offered, or sold goods or services in Washington and engaged in trade or commerce directly or indirectly affecting the people of Washington, as defined by RCW § 19.86.010(2).

93.    Washington's Consumer Protection Act, RCW § 19.86.010, et seq. ("CPA"), protects consumers by promoting fair competition in commercial markets for goods and services.

94.    To achieve that goal, the CPA prohibits any person from using "unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ." RCW § 19.86.020.

95.    Defendant engaged in unfair acts by: (i) raising prices due to tariffs; (ii) failing to disclose that it intended to seek tariff refunds; and (iii) retaining tariff refunds despite having passed the costs to its customers.

96.    Defendant's wrongful conduct occurred in the conduct of trade or commerce—i.e., while Defendant was engaged in the operation of its stores nationwide.

97.    Defendant has profited immensely from its unlawful conduct.

98.    As a result of Defendant's conduct, Plaintiff and the Class members were injured in their business or property—i.e., economic injury—in that they paid inflated prices for goods subject to illegal tariffs.

99.    As described throughout this Complaint, Defendant's conduct (1) caused substantial injury that is (2) not reasonably avoidable by consumers and that (3) is not outweighed by the benefits to consumers or competition.

100.    Defendant's unfair acts have injured a substantial portion of the public. Defendant's general course of conduct as alleged herein is injurious to the public interest, and the acts complained of herein are ongoing and/or have a substantial likelihood of being repeated as new tariffs are implemented.

101.    Defendant's unfair conduct proximately caused Plaintiff Parisi's  and the Class members' injuries because, but for the challenged conduct, Plaintiff and the Class members would not have paid price increases for goods subject to illegal tariffs that Defendant seeks to

18

recoup through refunds, and they did so as a direct, foreseeable, and planned consequence of that conduct.

102.    Plaintiff Parisi, individually and on behalf of the Class, seeks to enjoin further violation and recover actual damages and treble damages, together with the costs of suit, including reasonable attorneys' fees.

## COUNT IV
### Declaratory Relief, 28 U.S.C. § 2201
### (On behalf of Plaintiffs and the Class)

103.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

104.    Plaintiffs allege this claim individually and on behalf of the proposed Class.

105.    Federal courts have the power "to declare the rights and other legal relations of any interested party seeking such a declaration." 28 U.S.C. § 2201(a).

106.    Plaintiffs' claims present an actual controversy as to the rightful ownership of the tariff surcharges paid to Defendant.

107.    Plaintiffs have suffered an injury by having been required to pay Defendant a tariff surcharge because of the subject tariffs on Defendant's product. And Plaintiffs will imminently suffer an injury by Defendant's unlawful retention of the tariff refund.

108.    This Court can exercise its equitable power to enter a declaratory judgment that retention of the tariff surcharges paid by Plaintiffs but refunded to Defendant is unlawful for any of the above reasons.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and members of the proposed class pray for relief and judgment against Defendant, as follows:

a.      For an order certifying the proposed classes, appointing Plaintiffs and their counsel to represent the proposed class and notice to the proposed classes to be paid by Defendant;

b.      For damages suffered by Plaintiffs and members of the proposed class;

19

c.      For restitution to Plaintiffs and the proposed class of all monies wrongfully obtained by Defendant;

d.      For injunctive relief requiring Defendant to cease and desist from engaging in the unlawful, unfair, and/or deceptive practices alleged in the Complaint;

e.      An order awarding declaratory relief, retrospective and prospective injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and injunctive relief to remedy Defendant's past conduct;

f.      For Plaintiffs' reasonable attorneys' fees, as permitted by law;

g.      For Plaintiffs' costs incurred;

h.      For pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded; and

i.      For such other and further relief that this Court deems just and proper under equity or law, including the award of punitive damages.

DATED this 29th day of May, 2026.      Respectfully submitted,

By: */s/Kaleigh N. Boyd*
    Kaleigh N. Boyd, OSB No. 253094
    MCNAUL EBEL PLLC
    600 University Street, Suite 2700
    Seattle, WA 98101
    Tel: (206) 467-1816
    kboyd@mcnaul.com

    Jason T. Dennett*
    MILBERG, PLLC
    1700 7th Ave, Suite 2100
    Seattle, WA 98101
    Telephone: (516) 515-9124
    *jdennett@milberg.com*

Gary M. Klinger*
MILBERG, PLLC
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: 866.252.0878
*gklinger@milberg.com*

Zachary Arbitman*
Nicole A. Maruzzi*
FELDMAN SHEPHERD
WOHLGELERNTER TANNER
WEINSTOCK & DODIG, LLP
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
Telephone: (215) 567-8300
*zarbitman@feldmanshepherd.com*
*nmaruzzi@feldmanshepherd.com*

*Counsel for Plaintiffs*

**Pro Hac Vice* applications forthcoming